## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.  10-20037-JWL** |
| | ) | |
| **DONALD MILTON STEELE and** | ) | |
| **RANDY JAY DYKE,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

A jury convicted defendants Donald Milton Steele and Randy Jay Dyke of conspiracy to counterfeit Federal Reserve Notes (Count 1); conspiracy to intentionally manufacture, distribute and possess with intent to distribute more than 50 grams of methamphetamine, and to distribute hydrocodone, methadone and marijuana (Count 6); and possession with intent to distribute methamphetamine (Count 13).  In addition, the jury convicted Mr. Steele of three counts of identity theft (Counts 2, 3 and 5); two counts of distribution of marijuana (Counts 8 and 12); and of possessing a firearm in furtherance of a drug trafficking crime (Count 10).  The jury also convicted Mr. Dyke of one count of distribution of hydrocodone (Count 7) and two counts of distribution of methadone (Counts 9 and 11).

This matter is now before the court on Mr. Steele's motion for acquittal on the

basis of outrageous governmental conduct (doc. 205); Mr. Steele's motion for a new trial on Counts 2 and 5 pursuant to Rule 33 (doc. 206); Mr. Steele's motion for acquittal on the basis of insufficient evidence (doc. 207); and Mr. Dyke's motion for judgment of acquittal notwithstanding the verdict or, in the alternative, for a new trial (doc. 208). As explained below, the court grants Mr. Steele's motion for a new trial on Counts 2 and 5 and otherwise denies defendants' motions.

By way of background, this case stems from an undercover investigation of the defendants' activities beginning November 24, 2009 through February 17, 2010. The investigation ensued after Kelly Findley, a cooperating individual hoping to receive some consideration in his own case, introduced Detective Brian Clemmons (acting undercover) to Mr. Steele and Mr. Dyke at Mr. Steele's residence in Lawrence, Kansas. Mr. Steele's residence was known as "the Farm" and the vast majority of undercover operations that occurred between November 2009 and February 2010 occurred at the Farm.

**Outrageous Government Conduct**

Mr. Steele moves for acquittal on the methamphetamine conspiracy charged in Count 6; the methamphetamine portion of Count 10; and Count 13 on the grounds of outrageous government conduct. Mr. Dyke moves for acquittal on all counts on the grounds of outrageous government conduct. In essence, both defendants contend that the government acted outrageously by "creating" the methamphetamine crimes in this

case as to Mr. Steele and by creating all crimes in this case as to Mr. Dyke.  The court denies both motions on this issue.

The issue of outrageous conduct is a legal question for the court.  *United States v. Valona*, 834 F.2d 1334, 1343 (7th Cir. 1987).  "The relevant inquiry when assessing claims of outrageous government conduct is whether, considering the totality of the circumstances the government's conduct is so shocking, outrageous and intolerable that it offends the universal sense of justice."  *U.S. v. Worthon*, 520 F.3d 1173, 1181 (10th Cir. 2008).   The outrageous governmental conduct defense is distinct from the entrapment defense because the entrapment defense considers the predisposition of the defendant to commit the crime.  *U.S. v. Sneed*, 34 F.3d 1570, 1576-77 (10th Cir. 1994).  In contrast, the outrageous governmental conduct defense looks only at the government's conduct.  *Id.* at 1577.  The outrageous governmental conduct defense

> is an extraordinary defense reserved for only the most egregious circumstances.  It is not to be invoked each time the government acts deceptively or participates in a crime that it is investigating.  Nor is it intended merely as a device to circumvent the predisposition test in the entrapment defense.

*Id*.

To succeed on an outrageous conduct defense, the defendant must show either (1) excessive government involvement in the creation of the crime; or (2) significant governmental coercion to induce the crime.  *Worthon*, 520 F.3d at 1181.  Mr. Steele and Mr. Dyke contend only that the government created the crimes; they do not argue any coercion on the part of the government.   Excessive government involvement occurs if

the government "engineers and directs the criminal enterprise from start to finish." *U.S. v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir. 1994).  As the Circuit has explained,

> It is not outrageous for the government to infiltrate an ongoing criminal enterprise or to induce a defendant to repeat, continue or even expand previous criminal activity.  In inducing a suspect to repeat or expand his criminal activity, it is permissible for the government to suggest the illegal activity, provide supplies and expertise, and act as both a supplier and buyer of illegal goods.

*Id.*

Mr. Steele contends that the government in this case created and engineered the methamphetamine crimes in this case.  According to Mr. Steele, the government acted outrageously first by ingratiating itself with Mr. Steele (by having Detective Clemmons provide beer to him on multiple occasions and drive his daughter home from school) and then by initiating, through Mr. Findley, the idea of manufacturing and distributing methamphetamine.  Mr. Steele emphasizes his allegedly minimal involvement with the methamphetamine scheme and the fact that he had no prior history or involvement in methamphetamine use, manufacture or distribution.  Mr. Steele also urges that the conduct here is outrageous because the methamphetamine scheme was an unfair and illogical expansion of Mr. Steele's prior criminal activities, which were limited to distributing stolen checks, trading stolen property and selling marijuana.

Similarly, Mr. Dyke contends that the idea to manufacture and sell methamphetamine was exclusively the government's idea through either Mr. Findley or Detective Clemmons, that the government's participation in the crime was "excessive"

and that his own participation in the methamphetamine operation was minimal.   In addition, Mr. Dyke contends that the government created and engineered the counterfeiting crime and even duped Mr. Dyke into distributing prescription pills through its suggestion that Mr. Dyke trade prescription pills for antifreeze and motor oil and Detective Clemmons' feigning a bad back.

The court concludes that the defendants have not met the high standard of proving outrageous government conduct.  The evidence at trial certainly convinced the court that the government had reason to believe that both defendants were engaged in and desired to engage in a range of crimes and the government took reasonable measures that it believed based on its training and experience were necessary to ferret out those crimes by the use of an undercover officer and a cooperating individual.  The specific means and methods through which they ingratiated themselves with the defendants, such as providing beer for social occasions and providing items like antifreeze or a fuel pump in exchange for contraband were all appropriate measures to carry out the investigation.

Moreover, the court expressly rejects the defendants' contention that the government, through Mr. Findley, first raised the idea of manufacturing methamphetamine.  The evidence at trial, through the testimony of Detective Clemmons and an audio recording from a body wire worn by Detective Clemmons, demonstrates that on December 30, 2009, Mr. Findley, Detective Clemmons and Mr. Steele were traveling together in a car.  Mr. Findley asked Detective Clemmons something to the effect of "How do you feel about making a little meth?"  When Detective Clemmons

5

suggested that such activity was out of his realm of expertise, Mr. Findley responded by gesturing to Mr. Steele and saying "Scooter has been talking about it."[1]  Significantly, Mr. Steele did not respond in any way to Mr. Findley's statement.  Later that day, Detective Clemmons told Mr. Steele that he might know someone who could "cook" methamphetamine and Mr. Steele responded that he would either get "three meals and a cot" or be able to retire.  He enthusiastically stated, "Let's make some good ice," and advised Detective Clemmons that he had a place to do it and volunteered to put together a list of necessary chemicals.  In subsequent recorded conversations, Mr. Steele was a ready participant in the methamphetamine operation.

The court infers from both Mr. Steele's silence on the audio recording and his enthusiasm in helping to move the methamphetamine operation forward that, in fact, the statement made by Mr. Findley that Mr. Steele "has been talking about" making methamphetamine reflected the true state of Mr. Steele's mind.  Mr. Steele's failure to deny Mr. Findley's statement in the car or to challenge the substance of that conversation at any other time leads the court to conclude that Mr. Steele initiated the discussions of methamphetamine[2] and his subsequent conduct as it relates to the methamphetamine

---

[1]Mr. Steele was referred to at times as "Scooter."

[2]Mr. Steele suggest that the court cannot rely on Mr. Findley's statement because the government failed to substantiate the statement by calling Mr. Findley as a witness. But the court does not accept Mr. Findley's statement as true simply because Mr. Findley made the statement, but because Mr. Steele, in the face of that statement, did not deny it or otherwise challenge it.

operation leads the court to conclude that Mr. Steele was highly interested in pursuing and willing to engage in that activity.

The court further rejects Mr. Dyke's contention that the idea of the methamphetamine crimes was initiated by Detective Clemmons.  At trial, Mr. Dyke presented evidence in the form of an audio recording from a body wire worn by Detective Clemmons on November 24, 2009 during a conversation that Detective Clemmons was having with Mr. Findley.  This was the first time that Detective Clemmons and Mr. Findley visited the farm.  According to Mr. Dyke, Detective Clemmons can be heard saying, "Hey Kelly.  This tape is recording.  So don't talk about meth labs or don't talk about your history stuff cause that's gonna come out later on. Alright? Right on."  When called as rebuttal witness, Detective Clemmons testified that he did not mention "meth labs" on that occasion with Mr. Findley but he simply told Mr. Findley not to discuss his own criminal history because the recording would be played in court at some point.  The court credits Detective Clemmons' explanation of the context of the recording and rejects Mr. Dyke's suggestion that Detective Clemmons was somehow coaching Mr. Findley to save any discussion of "meth labs" for a later date.

As for Mr. Dyke's participation in the methamphetamine operation, the evidence at trial demonstrated that he was as willing and eager to pursue that activity as Mr. Steele.  Despite numerous audio recordings of conversations between Mr. Dyke and the undercover team, Mr. Dyke is never heard objecting to any plans concerning the methamphetamine operation and willingly shopped for certain chemicals without the

government's request or suggestion that he do so. When Detective Clemmons asked Mr. Dyke "what was in it for him," Mr. Dyke responded that Mt. Steele took very good care of him and that they "worked together."

For similar reasons, the court rejects Mr. Dyke's contention that the government created and engineered the counterfeiting conspiracy. The evidence at trial demonstrated to the court that Mr. Steele initially devised the counterfeiting scheme with the hopes of purchasing large quantities of marijuana with counterfeit currency. Although the government arguably took a lead role in purchasing items for use in the counterfeiting scheme (such as printers), the evidence demonstrated that Mr. Dyke actively participated in discussions about such purchases, even inquiring whether additional printers needed to be purchased, and willingly attempting to "convert" allegedly counterfeit currency into real currency by passing bills that he believed were counterfeit at a retail establishment.[3] With respect to Mr. Dyke's distribution of hydrocodone and methadone to the undercover team, the court, as noted above, believes that the government's methods–including Detective Clemmons' feigning a bad back and offering antifreeze in exchange for drugs–were entirely appropriate in the context of this case.

The defendants, then, have identified no conduct on the part of the government that is so outrageous as to violate their due process rights. The motions for acquittal on

---

[3]In light of Mr. Dyke's clear participation in the counterfeiting scheme, the court summarily rejects Mr. Dyke's one-sentence argument that the evidence at trial was insufficient to sustain a conviction against Mr. Dyke for the crime charged in Count 1.

the basis of outrageous government conduct are denied.

**Entrapment**

As an alternative to their argument that the government acted outrageously, both defendants move for acquittal on various counts on the grounds that no rational trier of fact, based on the evidence presented at trial, could have found that the defendants were not entrapped. Mr. Steele moves for acquittal on Count 1; the methamphetamine conspiracy charged in Count 6; Count 10; and Count 13 on the grounds that he was entrapped. Mr. Dyke moves for acquittal on all counts on the grounds that he was entrapped. The court denies both motions on this issue.

By way of background, the court instructed the jury as to the entrapment defense raised by defendants. Specifically, in Instruction 27, the court instructed the jury as follows:

> As a defense to several of the crimes charged in the Superseding Indictment, each defendant has asserted that he was entrapped. The defendant was entrapped if
>
> – the idea for committing the crimes originated with government agents, and
>
> – the government agents then persuaded or talked the defendant into committing the crimes, and
>
> – the defendant was not already willing to commit the crimes.
>
> When a person has no previous intent or purpose to violate the law, but is induced or persuaded by officers or agents to commit a crime, he is entrapped and the law, as a matter of policy, forbids his conviction in such

a case.  On the other hand, when a person already has the readiness and willingness to violate the law, and the officers or agents merely provide him with an opportunity to commit the crime and do so even by disguise or ruse, there is no entrapment.

In order to return a verdict of guilty as to each defendant for the crimes charged in <u>Count 1</u>, <u>Count 6</u>, <u>Count 7</u>, <u>Count 8</u>, <u>Count 9</u>, <u>Count 10</u>, <u>Count 11</u>, <u>Count 12</u> and <u>Count 13</u>, you must find beyond a reasonable doubt that the defendant was not entrapped.

For purposes of this case, Kelly Findley, the informant, was an agent of law enforcement officers.

In addition, the elements instruction of each Count identified in Instruction 27 required, as a separate element, that the government prove beyond a reasonable doubt that the defendant under consideration was not entrapped.  With respect to each Count challenged by defendants, the jury found that the government proved beyond a reasonable doubt that the defendants were not entrapped.

The defendants contend that no rational jury could have found the defendants guilty of the crimes beyond a reasonable doubt because no rational jury could have found that the defendants were not entrapped.  In analyzing the sufficiency of the evidence in the context of a motion for judgment of acquittal, the court views the evidence in the light most favorable to the government to determine whether "any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." *United States v. Irvin*, 656 F.3d 1151, 1162 (10th Cir. 2011) (citation omitted).  In doing so, the court "does not weigh conflicting evidence or consider witness credibility, as these duties are delegated exclusively to the jury." *Id.*  Instead, the court "presume[s] that the

jury's findings in evaluating the credibility of each witness are correct." *Id*. (citation omitted).

To carry its burden of showing that the defendants were not entrapped, the government (as explained in Instruction 27) had to establish only one of the following: (1) that the idea for the particular crime under consideration did not originate with government agents; (2) that the government did not persuade or talk the defendants into committing the crimes; or (3) that the defendants were predisposed to commit the crime. *See United States v. Ford*, 550 F.3d 975, 994 (10th Cir. 2008). Thus, so long as there is evidence in the record which, when viewed in the light most favorable to the government, supports the jury's conclusion on any one of these three elements, the jury's verdict must stand. As will be explained, there is sufficient evidence and the motions are denied.

The court begins with the methamphetamine crimes. As explained in some detail above in connection with the defendants' outrageous government conduct arguments, there is evidence in the record from which the jury could have reasonably concluded that the idea for manufacturing methamphetamine originated with Mr. Steele rather than government agents. Viewed in the light most favorable to the government, the fact that Mr. Steele remained silent in the face of Mr. Findley's December 30, 2009 statement to Detective Clemmons that "Scooter's been talking about" making methamphetamine, coupled with Mr. Steele's subsequent enthusiasm for the methamphetamine scheme, is sufficient evidence for the jury to conclude that Mr. Steele, rather than government

agents, initiated the methamphetamine scheme.  It was also reasonable for the jury to credit Detective Clemmons' explanation of his November 24, 2009 conversation with Mr. Findley concerning Mr. Findley's criminal history and to conclude that Detective Clemmons was not discussing a plan to introduce methamphetamine into the undercover investigation.  Thus, because the government's evidence is sufficient for a reasonable jury to conclude that the idea for the methamphetamine crimes did not originate with government agents, the defendants cannot meet their burden of showing that they are entitled to a judgment of acquittal on these counts.[4]

With respect to the counterfeiting conspiracy charged in Count 1, the jury heard evidence that Mr. Steele–prior to the undercover operation even starting–had plans to purchase large quantities of marijuana with counterfeit currency such that it was reasonable for the jury to conclude that the idea for the counterfeiting conspiracy did not originate with government agents.  Moreover, the evidence viewed in the light most favorable to the government demonstrated that neither Mr. Steele nor Mr. Dyke was persuaded or talked into committing the crime but that both men actively and enthusiastically participated in the plans to print and pass counterfeit currency.  Because

---

[4]While Mr. Steele challenges only the methamphetamine portion of the conspiracy charged in Count 6, Mr. Dyke broadly challenges all counts against him. Nonetheless, with respect to the marijuana, hydrocodone and methadone aspects of Count 6, as well as the distribution charges in Counts 7, 9 and 11, the evidence viewed in the light most favorable to the government is more than sufficient to establish that the idea for distributing these drugs did not originate with government agents.  Indeed, the court cannot recall any evidence–even viewed in the light most favorable to Mr. Dyke–that the idea originated with government agents.

there was evidence from which the jury could have reasonably concluded that the government proved beyond a reasonable doubt that the defendants were not entrapped as to Count 1, the court denies the motion as to Count 1.

Finally, with respect to Count 10, the firearm charge, the evidence viewed in the light most favorable to the government is sufficient to permit the jury to conclude that Mr. Steele ended up in possession of the firearm on January 30, 2009 based on his decision to trade a firearm with the fictional "meth cook" in exchange for pseudoephedrine pills that the cook had allegedly ordered rather than trade marijuana for the pills.  Moreover, even though Detective Clemmons presented the alternatives to Mr. Steele–that is, trading either a firearm or marijuana–the evidence demonstrated that Detective Clemmons did not persuade or otherwise encourage Mr. Steele to select the firearm option.  In short, because there is evidence in the record from which the jury could reasonably have concluded that Mr. Steele was not entrapped as to Count 10, the verdict must stand.  The motion is denied.

## Conspiracy to Distribute Marijuana, Hydrocodone and Methadone

Mr. Steele also moves for acquittal on Count 6 on the grounds that the evidence was insufficient to prove that Mr. Steele and Mr. Dyke conspired to distribute drugs that, according to Mr. Steele, each defendant distributed independently.[5]  According to Mr.

_____

[5]Mr. Steele's argument expressly excludes the methamphetamine conspiracy
(continued...)

Steele, the government's evidence proved only that Mr. Steele independently distributed marijuana and that Mr. Dyke independently distributed hydrocodone and methadone and did not prove the requisite interdependence, stated objective or agreement between the two defendants with respect to these drugs. As will be explained, the court disagrees and finds that the evidence was sufficient for the jury to find beyond a reasonable doubt that the defendants conspired to distribute marijuana, hydrocodone and methadone.

Mr. Steele is correct that the evidence at trial demonstrated that Mr. Steele distributed marijuana to the undercover team (and never pills) while Mr. Dyke distributed prescription pills to the undercover team (and never marijuana). Often, these drugs were traded for items that Mr. Steele wanted for his tree-trimming business such as heaters or climbing ropes or that Mr. Dyke wanted for his personal vehicle such as a fuel pump. To be sure, it may be that Mr. Steele did not always know whether or when Mr. Dyke was distributing pills and vice versa. Nonetheless, the evidence at trial demonstrated that Mr. Steele and Mr. Dyke engaged in those distribution activities as part of their overall common objective of facilitating and maintaining the operation of the farm and the myriad of activities that occurred there, including the running of the tree-trimming business as well as the pursuit of counterfeiting operations and, later, the potential manufacture and distribution of methamphetamine. *See United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006) (To prove knowledge of the essential

---

[5](...continued)
charged in Count 6.

14

objectives of the conspiracy, the government does not have to show the defendant knew all the details of a conspiracy; the government need only prove that the defendant shared a common purpose or design with his alleged coconspirators.).

Moreover, the evidence at trial demonstrated that Mr. Steele and Mr. Dyke were "partners" in all of the activities that occurred on the farm and that their drug distribution activities were seamlessly integrated into the overall criminal enterprise that these two men operated from the farm.  Indeed, the distribution activities occurred on the farm itself (and, on two occasions, the undercover team obtained both marijuana from Mr. Steele and prescription pills from Mr. Dyke on the same visit to the farm).  In addition, evidence was presented that Mr. Steele had knowledge of Mr. Dyke's distribution activities and sanctioned those activities to further the objectives of the overall conspiracy.  By way of example, on December 16, 2009, the undercover team provided heaters and climbing rope to Mr. Steele and, in return, Mr. Steele provided marijuana to the undercover team.  During the same exchange, however, the undercover team provided gallons of antifreeze to Mr. Steele, who advised the team that, in exchange for the antifreeze, they would receive prescription pills from Mr. Dyke at a later date. Consistent with Mr. Steele's statement, Mr. Dyke provided prescription pills to the undercover team in early January 2010 as payment for the antifreeze that was delivered to Mr. Steele.  In early February 2010, Mr. Dyke provided prescription pills to the undercover team and advised Detective Clemmons that he could pay for the pills later by providing Mr. Dyke with antifreeze and motor oil.  Later, Mr. Dyke advised Detective

15

Clemmons by telephone that he preferred a fuel pump for his vehicle as payment for the prescription pills. A few days later, the undercover team delivered the fuel pump for Mr. Dyke to Mr. Steele, who happened to be standing in the driveway when the undercover team arrived. The distribution activities of Mr. Steele and Mr. Dyke, therefore, are not nearly as distinct as Mr. Steele suggests.

For the foregoing reasons, there was sufficient evidence at trial for the jury to conclude beyond a reasonable doubt that Mr. Steele and Mr. Dyke conspired to distribute marijuana, hydrocodone and methadone. Mr. Steele's motion on this issue is denied.

**Identify Theft Instructions**

Mr. Steele seeks a new trial on Counts 2 and 5 based on the court's denial of his request that the court apply the holding of *Flores-Figueroa* to the elements instructions for Counts 2 and 5. In *Flores–Figueroa v. United States*, ⸺ U.S. ⸺, 129 S. Ct. 1886 (2009), the Court addressed the grammatical construction of the term "knowingly" in an aggravated identity-theft prosecution under 18 U.S.C. § 1028A(a)(1) and concluded that a defendant may be convicted of aggravated identify theft only if the government proves that the defendant knew that the means of identification belonged to a real person. *See United States v. Prince*, 647 F.3d 1257, 1266 (10th Cir. 2011). Mr. Steele contends that the logic in *Flores-Figueroa* must extend to prosecutions under 18 U.S.C. § 1028(a)(7), in which Congress utilized language virtually identical to § 1028A(a)(1). As will be explained, the court agrees with Mr. Steele, vacates his convictions on Counts 2 and 5

16

and orders a new trial on these counts.[6]

In *Flores–Figueroa*, the Supreme Court interpreted § 1028A(a)(1), which criminalizes "knowingly transfer[ing], possess[ing], or us[ing], without lawful authority, a means of identification of another person." The Court considered whether the "knowingly" *mens rea* element modified the sentence's direct object: "a means of identification of another person." *Prince*, 647 F.3d at 1266 (citing *Flores-Figueroa*, 129 S. Ct. at 1894). The "question was whether a defendant could be convicted of aggravated identity theft regardless of whether he actually knew his fake documentation belonged to someone else." *Id.*

By way of background, Flores–Figueroa was a Mexican citizen who obtained counterfeit identification documents for employment purposes. *Id.* at 1266 n.5. He initially received documents reflecting fabricated Social Security numbers and alien registration numbers. *Id.* Later, however, he received new documents with new numbers that, unlike his initial documentation, actually belonged to other people. *Id.* At trial, the government successfully argued that it was of no consequence whether Flores–Figueroa knew that his second set of documents was a "a means of identification of another person." *Id.* (citing *Flores-Figueroa*, 129 S. Ct. at 1888–89). The Supreme Court disagreed and applied § 1028A(a)(1)'s "knowingly" requirement to each term of

---

[6]Mr. Steele did not include the *Flores-Figueroa* element in his proposed instructions for Counts 2 and 5. Nonetheless, he briefly raised the issue during the instruction conference. The court regrets that it did not give the issue more consideration at the time.

the provision. *Id.* According to the Court, "[a]s a matter of ordinary English grammar,"

the word "knowingly" in § 1028A(a)(1) applies to each subsequently listed element in

the crime. *Id.* (quoting *Flores-Figueroa*, 129 S. Ct. at 1890). Under this interpretation,

"knowingly" modifies not only the verbs of the sentence, but also the direct object. *Id.*

As highlighted by Mr. Steele, the language of § 1028(a)(7) is nearly identical to

the language analyzed by the Supreme Court in *Flores-Figueroa*. Section 1028(a)(7)

criminalizes "knowingly transfer[ing], possess[ing], or us[ing], without lawful authority,

a means of identification of another person with the intent to commit, or to aid and abet,

or in connection with, any unlawful activity that constitutes a violation of federal law,

or that constitutes a felony under applicable State or local law." According to Mr.

Steele, then, common sense dictates that *Flores-Figueroa* applies to Counts 2 and 5 here

such that the jury should have been instructed that the government needed to prove that

Mr. Steele knew that the stolen checks he provided to the undercover team for the

purpose of procuring property for Mr. Steele belonged to a real person.

Two Circuit Courts of Appeals have touched on the issue raised by Mr.

Steele–one directly and one indirectly. The Fourth Circuit, albeit in an unpublished

opinion, has squarely held that *Flores-Figueroa* applies to a § 1028(a)(7) conviction.

*United States v. Berry*, 369 Fed. Appx. 500, 502 (4th Cir. Mar. 12, 2010). As explained

by the Fourth Circuit,

> Although *Flores-Figueroa* did not address the knowledge necessary for
> a §1028(a)(7) conviction, "when Congress uses the same language in two
> statutes having similar purposes, particularly when one is enacted shortly

> after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. Jackson, Mississippi*, 544 U.S. 228, 233 (2005). Because § 1028(a)(7)'s wording is virtually identical to § 1028A, both statutes criminalize identity theft, and § 1028A was passed shortly after § 1028(a)(7), we agree that the Supreme Court's holding in *Flores-Figueroa* should apply to a § 1028(a)(7) conviction, as well.

*Id.* Ultimately, the Fourth Circuit vacated the defendant's § 1028A conviction and his § 1028(a)(7) conviction on the grounds that the record was devoid of evidence establishing that the defendant knew the identification he stole belonged to a real person. *Id.*

In *United States v. Adibe*, the district court, after a bench trial, found the defendant guilty of both aggravated identity theft in violation of § 1028A and identity theft in violation of § 1028(a)(7) after concluding with respect to both counts that the defendant knew that the means of identification used actually belonged to a real person. 2010 WL 1286718, at *1, 5 (D. Del. Mar. 31, 2010). Although the court did not discuss extending *Flores-Figueroa* to § 1028(a)(7), the court expressly identified the "only disputed issue" for both counts as whether the defendant knew that the means of identification used belonged to a real person. *Id.* at *5. At sentencing, the defendant requested a two-point reduction in his offense level for acceptance of responsibility. *United States v. Adibe*, 2011 WL 2465470, at *1 (3rd Cir. June 22, 2011). The district court denied this request on the grounds that the defendant had "put the government to a substantial burden of proof" on both counts by contesting that he did not know that the identification materials he used belonged to real persons. *Id.* at *1-2.

On appeal to the Third Circuit, the defendant argued that the district court erred in finding that he had not accepted responsibility for his actions. *Id.* at *2. The Third Circuit disagreed and, in doing so, implicitly agreed with the district court that both the aggravated identity theft count and the identity theft count required the government to prove that the defendant knew that the identification materials he used belong to real individuals. *See id.* at *2. Discussing both counts together, the Third Circuit agreed with the district court that the defendant had contested "an essential factual element" of his identity theft scheme. Like the district court's opinion, then, the Third Circuit's opinion, without discussion, assumes that *Flores-Figueroa* applies to § 1028(a)(7).

The court believes that the Tenth Circuit, if faced with this issue, would follow the lead of the Fourth Circuit and the implicit suggestion of the Third Circuit and conclude that *Flores-Figueroa* extends to § 1028(a)(7) such that the government was required to prove that Mr. Steele had knowledge that the means of identification that he transferred to the undercover team (*i.e.*, checks, credit cards and a Kansas identification card all belonging to a woman named Julie Welsh) belonged to a real person. Because the instructions on Counts 2 and 5 omitted this element, the instructions were erroneous.

The court turns, then, to the government's contention that any error in the instruction is harmless in light of the overwhelming evidence at trial that Mr. Steele knew that the means of identification he transferred to the undercover team belonged to a real person. The government highlights that Mr. Steele advised the undercover team when transferring the materials that "it's a girl" and that her signature was an easy

signature to forge.   Nonetheless, the court cannot agree that the evidence overwhelmingly shows that Mr. Steele had the requisite knowledge.  This is not the "classic case" of identity theft described by the Court in *Flores-Figueroa* where the requisite knowledge is not difficult to prove.  *See Flores-Figueroa*, 129 S. Ct. at 1893 (knowledge easy to prove when defendant has used identification information to access that person's bank account; contacts real person under guise of bank employee to request personal information; or digging through person's trash to find discarded credit card and bank statements); *see also McKenzie v. United States*, 2011 WL 2836758, at *9 (M.D. Ala. May 25, 2011) (knowledge that documents belonged to real person reasonably inferred from fact that defendant stole checks from individual's mailbox).

Here, the record is devoid of any evidence explaining how Mr. Steele obtained Ms. Welsh's checks, credit cards and identification card.  Ms. Welsh testified that she left various boxes of personal property in the basement of her parents' home and that her parents apparently left those boxes in the basement of the home when they subsequently moved residences.  No evidence was presented, however, showing how the items in those boxes ultimately ended up in the hands of Mr. Steele.  Ms. Welsh testified that she did not know or recognize either defendant.  She further testified that, to her knowledge, a woman had been arrested in 2009 after negotiating Ms. Welsh's checks at various locations in Lawrence, Kansas.  Although Mr. Steele resides in Lawrence and nearly all of the illegal activities in this case occurred in Lawrence, no evidence was presented linking Mr. Steele to the woman who had been negotiating Ms. Welsh's checks.  In such

circumstances, the court cannot reasonably infer that Mr. Steele knew that the checks belonged to a real person.  The instruction error, then, was not harmless.  Mr. Steele is entitled to a new trial on Counts 2 and 5.  *See United States v. Serawop*, 410 F.3d 656, 669 (10th Cir. 2005) (instruction error is harmless only when court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error).  Mr. Steele's motion, then, is granted.

**Intoxication Instruction**

Prior to trial, Mr. Dyke proffered an intoxication instruction explaining that the jury could consider evidence "of the defendant's intoxication in deciding whether the government has proved beyond a reasonable doubt that the defendant acted with the intent required to commit the crimes charged."  The court declined to give this or any other intoxication instruction to the jury.[7]  Mr. Dyke now contends that the court erred by failing to give an intoxication instruction on the two conspiracy counts (Counts 1 and 6) and the substantive methamphetamine count (Count 13).  As will be explained, the court disagrees.

A defendant is not guilty of a specific intent offense if voluntary intoxication

---

[7]The court declined to give the instruction on the grounds that the crimes charged against Mr. Dyke are "general intent" crimes.  The court's conclusion as to the nature of the crimes was incorrect.  Nonetheless, the court's conclusion that an intoxication instruction was inappropriate was correct.

prevented the defendant from forming the requisite specific intent.  *United States v. Williams*, 403 F.3d 1188, 1194 (10th Cir. 2005).   The conspiracy counts and the methamphetamine count identified by Mr. Dyke are all specific intent crimes.  *United States v. Blair*, 54 F.3d 639, 642 (10th Cir. 1995) (conspiracy requires specific intent to further the unlawful activity which is the object of the conspiracy); *United States .v Cherry*, 433 F.3d 698, 701 (10th Cir. 2005) (possession of a controlled substance with intent to distribute is a specific intent crime).   Nonetheless, while a defendant is surely entitled to correct instructions on defenses supported by sufficient evidence for a jury to find in favor of the defendant, the evidence presented at trial was insufficient to necessitate an intoxication instruction.  To be entitled to an intoxication instruction, there must be evidence that a defendant's intoxication prevented him from forming the requisite intent required for a conviction.  See *United States v. Briseno-Mendez*, 1998 WL 440279, at *11 (10th Cir. July 17, 1998) (citing *United States v. Boyles*, 57 F.3d 535, 542 (7th Cir. 1995)).  As the Circuit emphasized in *Briseno-Mendez*,

> A bald statement that the defendant had been drinking or was drunk is insufficient–insufficient not because it falls short of the quantum of evidence necessary, but because it is not evidence of the right thing.  In order to merit an intoxication instruction  . . . the defendant must point to some evidence of mental impairment due to the consumption of intoxicants sufficient to negate the existence of the [specific] intent[.]"

*Id*. (quoting *Boyles*, 57 F.3d at 542).

   While there is certainly evidence in the record that Mr. Dyke drank beer on numerous  occasions during the relevant time period, that evidence does not warrant an

intoxication instruction. Significantly, very little evidence was introduced showing that Mr. Dyke was actually intoxicated on these occasions or, more to the point, that Mr. Dyke's alleged intoxication created a mental impairment sufficient to negate the existence of specific intent. The numerous audio recordings introduced at trial reveal Mr. Dyke speaking clearly and coherently during the commission of the crimes charged. The surveillance tape of the day of Mr. Dyke's arrest shows Mr. Dyke drinking a beer but he does not exhibit any signs typically associated with intoxication, including impaired speech or mobility. Indeed, even in his motion, Mr. Dyke does not point to evidence of intoxication or mental impairment–tellingly, he relies only "the abundant evidence that undercover officer Clemmons provided the Defendant with countless beer throughout the government's undercover operation." Of course, evidence of the government providing beer to Mr. Dyke fails to prove Mr. Dyke's mental impairment. In short, Mr. Dyke was not entitled to an intoxication instruction on the specific intent crimes. *See Boyles*, 57 F.3d at 542 (holding voluntary intoxication instruction not required when defendant, although inebriated at time of offense, failed to present evidence that his degree of inebriation made him incapable of forming requisite intent or resulted in suspension of his power to reason); *Briseno-Mendez*, 1998 WL 440279, at *11-12 (district court did not err in refusing to give intoxication instruction on conspiracy count where evidence, at most, showed that defendant was drunk but did not show requisite mental impairment). Mr. Dyke's motion on this issue is denied.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Mr. Steele's motion for acquittal on the basis of outrageous governmental conduct (doc. 205) is **denied**; Mr. Steele's motion for new trial pursuant to Rule 33 (doc. 206) is **granted**; Mr. Steele's motion for acquittal on the basis of insufficient evidence (doc. 207) is **denied**; and Mr. Dyke's motion for judgment of acquittal notwithstanding the verdict or, in the alternative, for a new trial (doc. 208) is **denied.**

**IT IS SO ORDERED** this 4th day of November, 2011.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

25